1
2
3
4
5
6
7        UNITED STATES DISTRICT COURT
8        CENTRAL DISTRICT OF CALIFORNIA
9
10   UNITED STATES OF                ) Case No. CV 13-1867 R (FFM)
     AMERICA,                        )
11                                   )
                      Plaintiff,     )  MEMORANDUM AND ORDER
12          v.                       )  CERTIFYING EXTRADITABILITY
                                     )
13   ISIDORO ZUÑIGA                  )
     GONZALEZ,                       )
14                                   )                ENT JS-6
     A Fugitive from the Government  )
15   of Mexico.                      )
                                     )
16                                   )
                      Defendant.     )
17   ———————————————————————         )

18                          **I.**

19                   **INTRODUCTION**

20          The United Mexican States ("Mexico") has requested the extradition of

21   Isidoro Zuñiga Gonzalez (the "fugitive") pursuant to the Extradition Treaty

22   between the United States of America ("United States" or "government") and

23   Mexico, signed at Mexico City on May 4, 1978 ("Extradition Treaty"), and entered

24   into force January 25, 1980.  *See* T.I.A.S. No. 9656, 31 U.S.T. 5059, 1980 WL

25   309106 (Jan. 25, 1980).

26   / / /

27   / / /

28   / / /

1

2

## II.

## <u>PROCEDURAL HISTORY</u>

On January 21, 2002, the First Judge of the Court of First Instance for Criminal Matters of the Judicial District of San Juan del Rio, Queretaro, Mexico issued a warrant for the arrest of the fugitive on charges of aggravated homicide. (Government's Filing of (1) Redacted Copy of Formal Extradition Papers, and (2) Request for Extradition (herein after "Gov't Ex."), filed March 18, 2013, A-1 at 20-41.)  On April 3, 2009, Mexico requested the fugitive's extradition from the United States.  (12-2972-M, CM/ECF ("ECF") No. 1, Ex. A.)  Supplemental extradition requests were issued on May 27, 2010 and April 30, 2012.  (*Id.* at Exs. B, C.)

On December 20, 2012, the United States District Court for the Central District of California issued a warrant for the arrest of the fugitive pursuant to Mexico's extradition request.  (*Id.* at ECF No. 2.)  The fugitive was arrested on December 21, 2012.  (*Id.* at ECF No. 5.)

On May 15, 2013, the government filed a Memorandum of Points and Authorities Regarding Extradition.  (CV 13-1867, ECF No. 25.)  On June 13, 2013, the fugitive filed an Opposition[1] to Government's Memorandum of Points and Authorities Regarding Extradition.  (*Id.* at ECF No. 31.)  On July 17, 2013, the government filed a Reply.  (*Id.* at ECF No. 36.)  On August 7, 2013, the Court held an extradition hearing on this matter.

This matter was subsequently transferred to the undersigned Magistrate Judge.  The Court has considered the record compiled in this case and reviewed the transcript of the August 7, 2013, extradition hearing.

---

[1]  The opposition includes the Declaration of Naeun Rim with proposed Defense Exhibits A-L.

1

2

### III.

### EVIDENCE PRESENTED

Dating back many years, there existed a feud between the families of Alejandro Bautista Osornio[2] (the "victim") and his half-brother Angel Zuñiga Bautista. (Gov't Ex. A-1 at 25, 53-54, 58.)[3]  On the night of January 5, 2002, the victim informed his wife that he had gotten into an argument with the fugitive, Angel's son. (*Id.* at 53-54.)  The victim then left for a dance. (*Id.*)

Members of a band that played at the dance remembered seeing the victim on the night of January 5, 2002. (*Id.* at 24.)  The victim was drunk and had offended members of the band and guests at the dance. (*Id.*)  The band members saw the victim leave the dance at approximately 1:30 a.m. on January 6, 2002.  The victim left with the fugitive and his brother Anastasio Zuñiga Gonzalez ("Anastasio") in the fugitive's white pickup truck. (*Id.* at 25, 31.)  When the band members saw the victim leave with the Zuñiga brothers they suspected the victim would be beaten. (*Id.* at 25, 31.)  The victim never returned home that night. (*Id.* at 54.)

The Zuñiga brothers arrived at the home of Pedro Martinez Duran in the early morning hours of January 6, 2002. (*Id.* at 29.)  The victim was not with them. (*See Id.* at 29.)  The men drank alcohol and then the brothers left to return home. (*Id.* at 29-30.)

---

[2]  At times the victim is also referred to as Alejandro Zuñiga Bautista. (*See*, *e.g.*, Gov't Ex. A-1 at 77.)

[3]  The pages of the government's exhibits are not numbered.  The Court has numbered them consecutively for identification.

3

1    The fugitive returned home early on the morning of January 6, 2002. (*Id.* at
2  30.) He slept until about 10:30 a.m. and then left. (*Id.*)

3    At about 11:00 a.m. on January 6, 2002, Pedro Gomez Bautista ("Gomez")
4  was in the yard of his mother's home when he saw an ambulance traveling toward
5  a nearby dam. (*Id.* at 57.) Gomez ran to where a crowd of people had gathered
6  and found the victim on his knees holding his head; he had been beaten. (*Id.* at 57-
7  58.) The victim was asked what happened, to which he only responded that "there
8  had been two." (*Id.* at 58.) The victim was transferred to the hospital, where he
9  died from the wounds sustained in the beating. (*Id.* at 26, 60-61, 63-74.) After
10 identifying the body, the victim's wife offered law enforcement descriptions of
11 Zuñiga family members as possible suspects in the death of her husband. (*Id.* at
12 54-55.)

13   The same day, Anastasio appeared before the Agent of the Public
14 Prosecutor. He denied having been at the dance and stated that he did not know
15 how the victim died. The prosecutor noted that Anastasio appeared nervous, had
16 an injury on his hand, and began to sweat and speak incoherently. (*Id.* at 28.)

17   The fugitive returned home that evening and told his wife that he was
18 leaving for the United States "because he already had a ticket, and that his [work]
19 permit was getting to the due date." (*Id.* at 30, 39.) The fugitive left for the United
20 States that evening. (*Id.* at 30, 39-40.)

21   On January 8, 2002, Anastasio gave a statement to investigators
22 ("Anastasio's First Statement"). He detailed the feud between his family and the
23 victim's family. (*Id.* at 77-78.) Anastasio admitted attending a dance with The
24 fugitive, arriving in the early morning hours of January 6, 2002. (*Id.* at 79.) He
25 explained that members of the band that played at the dance complained of the
26 victim's behavior. (*Id.*) As Anastasio and the fugitive were leaving the dance in
27 the fugitive's white pickup truck, the victim asked for a ride. (*Id.* at 79.) About 10
28 minutes into the drive, the victim became confrontational. (*Id.*) Anastasio asked

4

the fugitive to stop the truck so that Anastasio and the victim could "kick each other's asses." (*Id.*)  The fugitive stopped and Anastasio pulled the frightened victim out of the truck.  (*Id.*)  Anastasio kicked the victim and he fell to the ground.  (*Id.*)  The fugitive then exited the truck and he and Anastasio proceeded to beat the victim.  (*Id.* at 79-80.)  After beating the victim for about five minutes, Anastasio and the fugitive got back in the truck and left, leaving the victim lying on the ground.  (*Id.* at 80.)

On January 9, 2002, Anastasio led investigators through a crime scene reconstruction consistent with the statement he provided on the day prior, except he claimed that after he pulled the victim from the truck he thought the victim was reaching for something under his clothes ("Anastasio's Second Statement").  (*Id.* at 83-86.)

On August 11, 2009, members of the band that played at the dance identified a photograph of the fugitive as being Isidoro Zuñiga Gonzalez.  (Gov't Ex. A-2.)  On November 7, 2011, the victim's wife identified the fugitive from a photographic lineup as being the person she knows as Isidoro Zuñiga Gonzalez.  (Gov't Ex. A-1 at 88.)

Expert reports concluded that the victim's injuries were caused by at least two different perpetrators.  (Gov't Ex. A-1 at Ex.11 at 25.)

## IV.

## STANDARD FOR CERTIFICATION OF EXTRADITABILITY

Extradition from the United States is governed by 18 U.S.C. § 3184, which confers jurisdiction on "any justice or judge of the United States" or any authorized magistrate judge to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation.  The purpose of the extradition hearing is to determine whether a person arrested pursuant to a complaint in the United States on behalf of a foreign government is subject to

surrender to the requesting country under the terms of the pertinent treaty and relevant law. *See* 18 U.S.C. § 3184.  In order to surrender the person to the requesting country, the Court must determine that each of the following requirements have been met:  (1) the extradition magistrate has jurisdiction to conduct the extradition proceedings; (2) the extradition magistrate has jurisdiction over the fugitive; (3) an extradition treaty is in full force and effect; (4) the crime is extraditable (the dual criminality requirement); (5) there is probable cause to believe that the individual appearing before the magistrate judge has committed the crimes alleged by the requesting nation (the probable cause requirement); and (6) there are no applicable treaty provisions which bar the extradition for any of the charged offenses. *See Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000); *Quinn v. Robinson*, 783 F.2d 776, 783, 790 (9th cir. 1986); *Zanazanian v. U.S.*, 729 F.2d 624, 626 (9th Cir. 1984).

If these requirements are met, the extradition magistrate must certify the individual as extraditable to the Secretary of State and issue a warrant of commitment. *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003).  Once such a certification has been made, "it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive." *Id.*; 18 U.S.C. § 3184.  Extradition is a matter of foreign policy entirely within the discretion of the executive branch, and "the executive branch's ultimate decision on extradition may be based on a variety of grounds, ranging from individual circumstances, to foreign policy concerns, to political exigencies." *Blaxland*, 323 F.3d at 1208.  Thus, the authority of the extradition magistrate is limited to the judicial determination required by section 3184.

///

///

///

///

# V.

## **DISCUSSION**

Here, the fugitive does not contest the first four certification requirements. Rather, he argues that the government has failed to establish probable cause that he committed the crime charged and that the statute of limitations for pursuing charges against him has expired.  (ECF No. 31 at 16-33.)

## A.    **The Government Has Established Probable Cause**

The Extradition Treaty states that an "extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party."  Extradition Treaty, art. 3.  This provision "requires extradition under the [Extradition] Treaty to be based on competent evidence that would be sufficient to establish probable cause to hold a defendant for trial under United States law."  *Wang v. Masaitis*, 316 F.Supp.2d 891, 898 (C.D. Cal. 2004) (construing nearly identical treaty language) (quoting *Emami v. U.S. District Court*, 834 F.2d 1444, 1447 (9th Cir. 1987)); *see Barapind*, 400 F.3d at 747 ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes.") (citing *Quinn*, 783 F.2d at 783; *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000), *vacated on rehearing by Cornejo-Barreto v. Seifert*, 389 F.3d 1307 (9th Cir. 2004)); *see also* 18 U.S.C. § 3184; *Mainero v. Gregg*, 164 F.3d 1199, 1205 (9th Cir. 1999) (stating that the record must "contain[ ] competent evidence to support the conclusion that there was probable cause to believe the petitioner guilty") (quoting *Zanazanian*, 729 F.2d at 626), *superseded by statute on other grounds as stated in Cornejo-Barreto*, 218 F.3d at 1009 n.5.

/ / /

7

1       Under federal law, probable cause "exists when officers have knowledge or

2 reasonably trustworthy information sufficient to lead a person of reasonable

3 caution to believe that an offense has been or is being committed by the person

4 being arrested." *Rodis v. City, County of San Francisco*, 558 F.3d 964, 969 (9th

5 Cir. 2009) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).

6 "The probable cause standard is incapable of precise definition or quantification

7 into percentages" and is a "fluid concept" because it "depends on the totality of the

8 circumstances" and "turn[s] on the assessment of probabilities in particular factual

9 contexts . . . ." *Id.* at 969 (citations omitted).

10       "The function of the committing magistrate is to determine whether there is

11 competent evidence to justify holding the accused to await trial, and not to

12 determine whether the evidence is sufficient to justify a conviction." *Collins v.*

13 *Loisel*, 259 U.S. 309, 316, 42 S. Ct. 469, 66 L. Ed. 956 (1922). "The magistrate

14 does not weigh conflicting evidence and make factual determinations but, rather,

15 determines only whether there is competent evidence to support the belief that the

16 accused has committed the charged offense." *Quinn*, 783 F.2d at 815; accord,

17 *Barapind*, 400 F.3d at 750, 752. Thus, "[a]n extradition proceeding is not a trial . .

18 . ." *Emami*, 834 F.2d at 1452 (citing *Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.

19 Ct. 945, 57 L. Ed. 1274 (1913)); *see Quinn*, 783 F.2d at 817 n.41 (noting the "well-

20 established rule that extradition proceedings are not to be converted into a dress

21 rehearsal for trial") (quoting *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir.

22 1976)); *see also Blaxland*, 323 F.3d 1198, 1208 (9th Cir. 2003) ("American

23 judicial officers conduct a circumscribed inquiry in extradition cases."). "If the

24 evidence is sufficient to sustain the charge, the inquiring magistrate judge is

25 required to certify the individual as extraditable to the Secretary of State and to

26 issue a warrant." *Blaxland*, 323 F.3d at 1208 (citing *Lopez–Smith v. Hood*, 121

27 F.3d 1322, 1326 (9th Cir.1997), *superseded by statute on other grounds as stated*

28 *in Cornejo-Barreto*, 218 F.3d at 1009 n.5.).

1    Although the federal probable cause standard applies, the probable cause

2    finding need not be "predicated upon evidence that would be admissible at a

3    preliminary hearing or before a grand jury in the United States." *Zanazanian*, 729

4    F.2d at 626 (citing *Collins*, 259 U.S. at 317).  The magistrate judge's function is

5    "to determine whether there is 'any' evidence sufficient to establish reasonable or

6    probable cause." *United States ex rel. Sakaguchi v. Kaulukukui*, 520 F.2d 726,

7    730–731 (9th Cir.1975); *see Cleugh v. Strakosch*, 109 F.2d 330, 333 (9th Cir.

8    1940) (stating, in an extradition case, that "the sole question was, and is, whether

9    there was any evidence warranting the finding that there was reasonable or

10   probable cause to believe appellee guilty - not whether such evidence was

11   sufficient, but whether there was any such evidence").

12   The Court finds that the government has offered sufficient evidence of

13   probable cause to believe that the fugitive committed the crime charged.

14   **B.    The Fugitive's Proffered Evidence Does Not Defeat the Government's**

15   **Showing.**

16   The fugitive attacks the government's showing primarily by relying on

17   evidence he has submitted.  The fugitive argues that this additional evidence

18   demonstrates that Anastasio's First and Second statements were procured by

19   torture and are not reliable.  The fugitive also argues that Anastasio made a number

20   of inconsistent statements that also preclude reliance on any particular version of

21   Anastasio's testimony.

22   Given the nature of extradition proceedings, evidence that is submitted by

23   the accused is strictly limited.  As the Supreme Court has stated, to allow the

24   accused to introduce evidence contradicting the showing made by the requesting

25   government would result in compelling the foreign government "to go into a full

26   trial on the merits in a foreign country. . . .  This would be in plain contravention of

27   the intent and meaning of the extradition treaties." *Collins*, 259 U.S. at 316.

28   Therefore, evidence that contradicts or controverts the existence of probable cause

9

1    is inadmissible in extradition proceedings, including evidence establishing a

2    defense or exonerating the excused.  *Id.* at 316.  However, the accused may offer

3    evidence that might explain "ambiguities or doubtful elements" in the

4    government's case.  *Id.* at 315-16.

5         Here, the fugitive argues that evidence that Anastasio made the First and

6    Second Statements under coercion does not contradict those statements, but

7    demonstrates their unreliability.  The Court finds, however, that allowing the

8    proffered evidence would create the same credibility contest that is prohibited in

9    extradition proceedings.  The Court is persuaded by the reasoning in *In re*

10   *Extradition of Santos*, 795 F.Supp.2d 966, 988-90 (C.D. Cal. 2011), in this regard.

11        Nonetheless, even if the fugitive's proffered evidence could be considered

12   under the theory that it did not contradict the government's evidence, it still would

13   not defeat the government's probable cause showing.  The fugitive offers these

14   additional statements allegedly made by Anastasio:

15        (1) In January 11, 2002 court proceedings, Anastasio stated that he "does not

16   ratify the declarations [*i.e.*, Anastasio's First and Second Statements] that were

17   given before the public investigating prosecutor."  ("Anastasio's Third Statement")

18   (Defense Exhibit C).

19        (2) On February 14, 2002 during a court proceeding, Anastasio stated that he

20   did not agree with Anastasio's First and Second Statement.  Anastasio then

21   described the events on the morning of January 6 in a manner essentially consistent

22   with those prior statements except that Anastasio claimed that the victim argued

23   with the fugitive in the truck and that it was the victim who told the fugitive to stop

24   the truck.  Anastasio also stated that he stayed in the truck while the fugitive and

25   the victim fought outside.  He further stated that after five minutes of seeing the

26   two men fighting, he told the fugitive to let the victim alone and

27   / / /

28   / / /

10

1  leave.  After which the fugitive reentered the truck and drove away with Anastasio
2  leaving the victim behind.

3      Anastasio further stated that his prior statements (*see* First and Second
4  Statement) had been coerced by torture, which he described.  Anastasio explained
5  that it was because of the torture that he had blamed himself when really the
6  fugitive was the responsible party.  ("Anastasio's Fourth Statement") (Defense
7  Exhibit D).

8      (3) On May 8, 2013, ten years after he had been convicted of the crime and
9  while serving a 17 year sentence for that crime, Anastasio signed a declaration
10 from prison.  In this declaration, Anastasio again asserted that he had been tortured,
11 although the timing of the alleged torture with respect to his prison statements is
12 not entirely clear.  It appears that Anastasia claims to have told the judicial police
13 officers that the fugitive remained in the car while Anastasio alone beat the victim,
14 but that he signed some blank pages that presumably were filled in later by the
15 judicial police.  The following day appears to be when Anastasio claims to have
16 been tortured and to have signed a statement that he had not read.  However,
17 Anastasio also states that his defense attorney told him to blame the fugitive as a
18 strategy.  In any event, Anastasio seems to confirm in the declaration a version of
19 events as follows:  Anastasio and the fugitive had given the victim a ride after a
20 party; that during the drive the victim insulted Anastasio; that Anastasio told the
21 fugitive to stop the car and, when the care stopped, Anastasio and the victim got
22 out of the car and started to fight.  Anastasio further declared that he did not intend
23 to kill the victim, just "put him in his place."  ("Anastasio's Fifth Statement")
24 (Defense Exhibit A).

25     All of Anastasio's five statements contain a common thread, to wit:
26 Anastasio and the fugitive gave a ride to the victim after a party; the fugitive
27 stopped the vehicle to facilitate a fight with the victim; that either or both the
28 fugitive and Anastasio beat the victim; and that the fugitive and Anastasio drove
   off leaving the victim behind.  These statements are particularly damning given the

victim's statement that he had been beaten by two men and the forensic report that the victim had been beaten by at least two men. Thus, even if the Court could consider this additional evidence, the evidence in total tends to support rather than defeat the government's showing of probable cause.

In any event, even without considering any of Anastasio's statements, there remains sufficient evidence of probable cause to certify the fugitive for extradition.

There is ample evidence, and little apparent dispute, of a feud between the fugitive and the victim's families. (Gov't Ex. A-1 at 25, 53-54, 58.) The victim's wife claimed that, on January 5, 2002, the fugitive and the victim had an argument. (*Id.* at 53-54.) In the early morning hours of January 6, 2002, witnesses saw the victim, the fugitive, and Anastasio leave a dance together in the fugitive's truck. (*Id.* at 25-31.) The fact that the men left together caused sufficient concern that the witnesses suspected the victim would be beaten by the fugitive and Anastasio. (*Id.* at 25, 31.) The fugitive did not drive the victim home, as the victim never returned home following the dance. (*Id.* at 54.) Yet, when the fugitive and Anastasio arrived at the home of Pedro Martinez Duran early on the morning of January 6, 2002, the victim was not with them. (*See id.* at 29.)

Later on January 6, 2002, the victim was found injured on the side of the road and indicated that he had been beaten by two men; he later died. (*Id.* at 26, 57-58, 60-61, 63-74.) On the same day, Anastasio was questioned by law enforcement regarding the death. (*Id.* at 28.) That evening, the fugitive informed his wife that he was returning to the United States and subsequently left Mexico. (*Id.* at 30, 39-40.)

This evidence, without considering the statements of Anastasio, may be insufficient to sustain a conviction against the fugitive for the death of the victim. However, the evidence is sufficient to establish probable cause that the fugitive committed the crime and certify him for extradition to face charges. *See Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine

12

1  whether there is competent evidence to justify holding the accused to await trial,
2  and not to determine whether the evidence is sufficient to justify a conviction.").
3  **B.    The Prosecution of the Fugitive Does Not Violate the Statute of**
4  **Limitations**
5          Article 7 of the Extradition Treaty provides the following:
6                  Extradition shall not be granted when the prosecution or the
7          enforcement of the penalty for the offense for which extradition has
8          been sought has become barred by lapse of time according to the laws
9          of the requesting or requested Party.
10  Extradition Treaty, art. 7.  Thus, the Court must determine whether the criminal
11  prosecution against the fugitive is barred by the statute of limitations of either
12  Mexico or the United States.  *See Theron v. U.S. Marshal*, 832 F.2d 492, 498 (9th
13  Cir. 1987) (court must look to federal, not state, limitations period when
14  considering extradition "because the United States is the contracting party to the
15  treaties, not the individual states"), *abrogated on other grounds by United States v.*
16  *Wells*, 519 U.S. 482, 117 S. Ct. 921, 137 L. Ed. 2d 107 (1997).
17          The fugitive concedes that he was arrested before the expiration of the
18  statute of limitations under Mexican law.  (ECF No. 31 at 31.)  However, he argues
19  that his arrest occurred after the expiration of the limitations period provided under
20  United States law and, therefore, he must not be extradited to face charges in
21  Mexico.  (*Id.* at 27-33.)
22          As an initial matter, the Court must determine which United States statute of
23  limitations applies to the Mexican homicide charge.  To do so, the Court must look
24  to the substantive offense under United States law which is most closely analogous
25  to the charged offense, and apply the statute of limitations applicable to
26  / / /
27  / / /
28  / / /

13

1   that offense.  *Extradition of Suarez-Mason*, 694 F.Supp. 676, 686 (N.D. Cal. 1988).

2   Here, the homicide charge in Mexico is most analogous to the federal crimes set

3   forth at 18 U.S.C. § 1111 (murder) and 18 U .S.C. § 1112 (manslaughter).

4          Within the federal crime of murder under 18 U.S.C. § 1111 there exists a

5   distinction between first degree murder and second degree murder.  First degree

6   murder is defined as "[e]very murder perpetrated by poison, lying in wait, or any

7   other kind of willful, deliberate, malicious, and premeditated killing," a killing

8   "committed in the perpetration of, or attempt to perpetrate, any arson, escape,

9   murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or

10  sexual abuse, child abuse, burglary, or robbery," a killing "perpetrated as part of a

11  pattern or practice of assault or torture against a child or children, or a killing

12  "perpetrated from a premeditated design unlawfully and maliciously to effect the

13  death of any human being other than him who is killed."  18 U.S.C. § 1111(a).

14  "Any other murder is murder in the second degree."  *Id.*  In addition, manslaughter

15  is defined by federal law as "the unlawful killing of a human being without

16  malice."  18 U.S.C. § 1112(a).

17         First degree murder, for which the death penalty may be imposed, 18 U.S.C.

18  § 1111(b), is not subject to any statute of limitations.  18 U.S.C. § 3281.  However,

19  second degree murder and manslaughter, which are noncapital offenses, 18 U.S.C.

20  §§ 1111(b), 1112(b), are subject to a five year statute of limitations.  18 U.S.C.

21  3282(a).

22         When determining the analogous United States offense for extradition

23  purposes, the primary focus should be on the nature of the conduct charged.

24  *Clarey v. Gregg*, 138 F.3d 764, 766-77 (9th Cir. 1998).  The evidence of probable

25  cause of the fugitive's guilt submitted by Mexico most resembles the federal

26  / / /

27  / / /

28

14

1  crimes of second degree murder or manslaughter, which carry a five year statute of
2  limitations.[4]

3       Federal law provides that "no person shall be prosecuted, tried, or punished
4  for any offense, not capital, unless the indictment is found or the information is
5  instituted within five years after such offense shall have been committed.  18
6  U.S.C. § 3282(b).  The victim's death occurred on January 6, 2002.  (Gov't Ex. A-
7  1 at 59-74.)  Accordingly, absent tolling of the five year statute of limitations,
8  criminal charges would have been barred as of January 6, 2007.

9       The Ninth Circuit has held that "for the purposes of a civil proceeding such
10  as an extradition, a Mexican arrest warrant is the equivalent of a United States
11  indictment and may toll the United States statute of limitations." *Sainez v.*
12  *Venables,* 588 F.3d 713, 717 (9th Cir. 2009).  Under this authority, the five year
13  statute of limitations under 18 U.S.C. § 3282 was tolled as of January 21, 2002, the
14  date on which the Mexican warrant for the fugitive's arrest issued.  (Gov't Ex. A-1
15  at 19-41.)

16       The fugitive attempts to distinguish *Sainez* from the present case.  He argues
17  that the Ninth Circuit in *Sainez* had to accept the Mexican arrest warrant for tolling
18  purposes because Mexican law was unclear and the United States court could not
19  guess whether an arrest warrant was sufficient to toll the statute of limitations
20  under Mexican law.  The fugitive offers the following quote from *Sainez* to support
21  his argument:

22

23  ─────────────────

24    [4]  The Court is aware of the holding in *Extradition of Kraiselburd*, 786 F.2d
   1395 (9th Cir. 1986) that for extradition purposes all murder charges are to be
25  considered capital offenses and, thus, not subject to a limitations period.  786 F.2d
26  at 1398.  However, the government does not so argue, (*see* Reply at 23-24), and the
   holding in *Kraiselburd* has been called into question.  *See Extradition of Patterson*,
27  CV 11-5459-ODW (MRW), 2012 WL 5379152, at *7-*8 (C.D. Cal. Oct. 30,
28  2012).

1    We do not reach this conclusion by attempting to analogize a
2    Mexican arrest warrant to an American indictment.  Rather, we reach
3    this conclusion by adhering to our established approach of giving
4    credence to foreign proceedings.  Indeed, we have declined to rule on
5    the procedural requirements of foreign law out of respect for other
6    nations' sovereignty and because we recognize the chance of
7    erroneous interpretation is much greater when we try to construe the
8    law of a country whose legal system is not based on common law
9    principles.
10   (ECF No. 31 at 30-31.)  The fugitive further argues that there is no guesswork here
11   regarding Mexican law because the government has provided Mexican court
12   decisions stating that the arrest warrant did not toll the Mexican statute of
13   limitations for the charges against the fugitive.  (*Id.* at 31.)
14         The premise of the fugitive's argument is flawed.  The fact that a Mexican
15   court has concluded that a Mexican arrest warrant does not toll the Mexican statute
16   of limitations is of no relevance to whether, under United States law, a Mexican
17   arrest warrant tolls the statute of limitations in the United States.  On that question,
18   the Ninth Circuit has explicitly found that a Mexican arrest warrant does toll the
19   United States statute of limitations.  *Sainez*, 588 F.3d at 717.
20         The language quoted by the fugitive does nothing to call the holding in
21   *Sainez* into doubt.  Rather, the significance of the quoted language is to highlight
22   the difficulty in comparing the indictment procedure of the United States to foreign
23   criminal procedures and explain why the United States must equate a foreign arrest
24   warrant to a United States indictment even though they are seen to be separate
25   procedures under our law.  As noted by the district court decision in *Sainez*, and
26   highlighted by the quoted language by the Ninth Circuit, it is difficult to merely
27   overlay the requirements of 18 U.S.C. § 3282 onto a foreign criminal justice
28   system.  To do so would ask "this Court to apply the U.S. statute of limitations,

16

which incorporates indictments, informations and common law concepts, to the Mexican judicial system, in which these concepts are unknown." Extradition of Sainez, No. 07-MJ-0177-JMA, 2008 WL 366135, at *8 (S.D. Cal. Feb. 8, 2008). For this reason, the Ninth Circuit in *Sainez* could not "analogize a Mexican arrest warrant to an American indictment." *Sainez*, 588 F.3d at 717. Instead, the Ninth Circuit had to conclude that, rather than attempt to interpret a foreign law so as to make it analogous to our common law concepts, it must accept the Mexican arrest warrant as "equivalent" to the indictment for statute of limitations purposes. *See Extradition of Nunez*, No. 10-24020-MC, 2011 WL 281030, * 4 (S.D. Florida Jan. 26, 2011) (citing to *Sainez* and explaining the necessity of accepting a Japanese arrest warrant for purposes of tolling the statute of limitations where a Japanese indictment operated differently than an indictment in the United States).

Accordingly, it is clear that the Mexican arrest warrant of January 21, 2002 was issued before the expiration of the five year limitations period under United States law and that the issuance of that arrest warrant tolled the limitations period. The fugitive, therefore, may not avoid extradition on the grounds that the charges against him are untimely.[5]

## C.   <u>REQUEST FOR BOND PENDING APPEAL</u>

Finally, the fugitive explains his intention to appeal the Court certification on the issues of the admissibility of torture evidence and the statute of limitations. He concludes that the habeas corpus and appellate process related to these issues

---

[5] Because the Court finds that the issuance of the Mexican arrest warrant tolled the limitations period, the Court need not determine whether the fugitive's return to the United States following the alleged crime amounts to flight for purposes of tolling the statute of limitations.

17

1    will be unusually protracted, thus warranting his release on bond pending appeal.

2    (ECF No. 31 at 33.)

3         "There is a presumption against bail in an extradition case and only 'special

4    circumstances' will justify bail." *Salerno v. United States*, 878 F.2d 317, 317 (9th

5    Cir. 1989) (citing *Wright v. Henkel*, 190 U.S. 40, 63, 23 S. Ct. 781, 47 L. Ed. 948

6    (1903)).  "Because an extradition proceeding is not a criminal case, the Bail

7    Reform Act of 1984 does not govern, nor is its presumption in favor of bail a part

8    of extradition proceedings." *Extradition of Beresford-Redman*, 753 F.Supp.2d

9    1078, 1086 (C.D. Cal. 2010).  Although the term "special circumstances" has never

10   been precisely defined, the Ninth Circuit has found that "[e]xamples of such

11   circumstances include the raising of substantial claims upon which the appellant

12   has a high probability of success, a serious deterioration of health while

13   incarcerated, and unusual delay in the appeal process." *Salerno*, 878 F.2d at 317.

14        First, the fugitive has not raised substantial claims upon which he has a high

15   probability of success.  Because sufficient probable cause exists to certify the

16   fugitive for extradition even accepting the evidence proffered by the fugitive,

17   whether or not torture evidence may be admissible is not dispositive of the

18   fugitive's extraditability.  Moreover, the issue of the statute of limitations has

19   already been resolved by the Ninth Circuit.

20        In addition, the fugitive has not alleged a serious deterioration in his health

21   while incarcerated.

22        Finally, although the fugitive alleges that his appellate proceedings "will be

23   unusually protracted" he offers nothing in support of this conclusion other than the

24   fact that he must follow procedures for filing a habeas corpus action before

25   presenting his claims to the Ninth Circuit.  That the fugitive must follow the

26   standard appellate procedure does nothing to prove that his action will be

27   "unusually" delayed.

28   / / /

Accordingly, the fugitive has not provided any basis upon which the Court can find special circumstances warranting his release on bond pending appeal of this decision.

## VI.

## FINDINGS, CONCLUSIONS, AND CERTIFICATION

For the reasons discussed above, the Court certifies Isidoro Zuñiga Gonzalez for extradition to Mexico on the charges of the aggravated homicide of Alejandro Bautista Osornio, and makes the following findings and conclusions in support of this Memorandum and Order:

1. This Court has jurisdiction over the proceedings;

2. This Court has jurisdiction over Isidoro Zuñiga Gonzalez;

3. There is a valid extradition treaty between the United States and Mexico in full force and effect;

4. The Mexican offense of aggravated homicide is an extraditable offense consisting of conduct considered to be criminal in both the United States and Mexico, and which is punishable by deprivation of liberty for a period of more than one year;

5. There is probable cause to believe that Isidoro Zuñiga Gonzalez committed the crime of aggravated homicide;

6. There are no applicable treaty provisions which bar extradition, including the Treaty's requirement of a timely prosecution; and

7. Mexico's formal papers and documents in support of its request for the extradition of Isidoro Zuñiga Gonzalez are and have been presented in accordance with the laws of the United States of America and the Treaty, and have been translated and authenticated in the manner required by the Treaty.

/ / /

19

8.     The Court hereby certifies the above findings and conclusions, and the transcripts of the extradition hearing held in this case, to the Secretary of State, pursuant to 18 U.S.C. § 3184.

9.     The request of Isidoro Zuñiga Gonzalez to be released on bond pending appeal is denied.

Dated: April 9, 2014

                              /S/ FREDERICK F. MUMM
                              FREDERICK F. MUMM
                              United States Magistrate Judge

20